LEVY DAVIS & MAHER, LLP
Attorneys for Plaintiff
Jonathan A. Bernstein (JB 4053)
39 Broadway, Suite 1620
New York, New York 10006
(212) 371-0033

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AHNA BLUTREICH,                                    :
                                                   :      13 Civ. 8583 (DAB)
                              Plaintiff,            :
                                                   :      **SECOND AMENDED**
              - against -                           :      **COMPLAINT AND**
                                                   :      **<u>DEMAND FOR JURY TRIAL</u>**
NORTH SHORE-LONG ISLAND JEWISH                     :
HEALTH SYSTEM, INC., and WILLIAM                   :
RODGERS,                                           :
                                                   :
                              Defendants.           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        Plaintiff Ahna Blutreich (hereinafter "Blutreich"), by her attorneys, Levy Davis & Maher,

LLP, complaining of defendants North Shore-Long Island Jewish Health System, Inc.

(hereinafter "NSLIJHS") and William Rodgers, M.D. (hereinafter "Dr. Rodgers") alleges:


                        <u>NATURE OF THE ACTION</u>

        1.      This is a civil rights action to redress the deprivation of rights accorded to plaintiff

Blutreich pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title

VII"); the Civil Rights Act of 1991, 42 U.S.C. § 1981A ("1991 CRA"); Title 8 of the

Administrative Code of the City of New York,  N.Y.C. Admin. Code § 8-101 *et seq.* ("Title 8" or

"NYCHRL") and the common law of the State of New York.

        2.      Dr. Blutreich was a pathologist at Lenox Hill Pathology, a captive pathology

practice at Lenox Hill Hospital. She was subjected to a course of sexual harassment by Dr. Rodgers, her employer/supervisor. Dr. Blutreich, through counsel, negotiated a settlement agreement with Lenox Hill, which was then in the process of being acquired by NSLIJHS. The agreement called for the NSLIJHS to give a prescribed response to persons seeking references for Dr. Blutreich.

3.     Statements by administrators at NSLIJHS departed from the agreed reference and gave objectively inaccurate information to potential employers of Dr. Blutreich. Notwithstanding its actual knowledge that it had done so, NSLIJHS  repeatedly ratified that conduct, which, upon information and belief, resulted in Dr. Blutreich's loss of multiple career opportunities. That is, Dr. Blutreich having sought to vindicate her civil rights, NSLIJHS retaliated therefor by providing false, inaccurate and/or misleading information to Dr. Blutreich's prospective employers, breaching a duly negotiated contract with her. and interfering with her prospective business relations. Dr. Rodgers aided and abetted that retaliation and interfered with Dr. Blutreich's prospective business relations.

4.     Defendants' actions are unlawful, and Dr. Blutreich brings this action seeking injunctive and declaratory relief, compensatory and punitive damages and other appropriate equitable and legal relief as may be necessary to compensate her.

## JURISDICTION AND VENUE

5.     This court has jurisdiction of this matter pursuant to (i) 28 U.S.C. §§ 1343(3) and 1343(4), which confer original jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil

rights; (ii) the Declaratory Judgment Statute, 28 U.S.C. § 2201; (iii) 42 U.S.C. § 2000e *et seq.* and (iv) 28 U.S.C. § 1367(a), in that the state and federal claims arise from a common nucleus of operative fact such that they are so related that they form part of the same case or controversy under Article III of the United States Constitution.

6.     Venue is proper in this Court pursuant to § 706(f)(3) of Title VII, 42 U.S.C. § 2000e-5(f)(3), inasmuch as the unlawful employment practices complained of herein occurred within the Southern District of New York.  Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b), inasmuch as the defendant has offices, conducts business and can be found in the Southern District of New York, and the causes of action arose and occurred in the Southern District of New York.

## **PARTIES**

7.     Plaintiff Ahna Blutreich, M.D. is a natural person who resides in the City, County and State of New York.  She was employed by Lenox Hill Pathology, P.C., Lenox Hill Hospital and/or NSLIJHS from on or about July 2010 to on or about April 2012.

8.     NSLIJHS is, upon information and belief, a domestic not for profit corporation, with a principal place of business in the Village of Great Neck, Town of North Hempstead, County of Nassau, State of New York. It owns and operates Lenox Hill Hospital in the City, County and State of New York. At all relevant times, it was an "employer" within the meaning of Title VII and the NYCHRL.

9.     William Rodgers, M.D., is a natural person who, upon information and belief, resides in the City, County and State of New York.

3

## PROCEDURAL REQUIREMENTS

10.     Plaintiff incorporates by reference Paragraphs 1 through 9 of this Complaint as though the same were set forth fully herein.

11.     Dr. Blutreich timely filed a Charge of Discrimination on or about March 6, 2013, with the United States Equal Employment Opportunity Commission ("EEOC"). On or about December 18, 2013, the EEOC issued her a Notice of Right to Sue.

12.     Plaintiff has satisfied the filing requirements of Title 8 of the Administrative Code of the City of New York.

## STATEMENT OF THE CLAIM

13.     Plaintiff incorporates by reference Paragraphs 1 through 12 of this Complaint as though the same were set forth fully herein.

14.      Dr. Blutreich was a pathologist at Lenox Hill Hospital from July 2010 to April 2012. Specifically, she worked for William Rodgers, M.D. Dr. Rodgers was the head of Lenox Hill Pathology, P.C., which was a "captive" practice of the Hospital. In approximately October 2011, she became an employee of Lenox Hill.

15.     From virtually the beginning of Dr. Blutreich's employment with him, Dr. Rodgers sexually harassed her. The harassment became progressively more severe until finally, in early 2012, she asked Dr. Rodgers to stop. She was then fired without cause. Her attorney, on or about April 28, 2012, then contacted Lenox Hill and negotiated an out-of-court settlement that confirmed that her employment had ended.

16.     At the time, Lenox Hill was in the process of becoming acquired by NSLIJHS.

Ultimately, an Agreement and General Release ("Agreement") was signed by both Lenox Hill and NSLIJHS. The Agreement was executed on or about July 18, 2012. The terms of the Agreement are confidential. However, actions to enforce the agreement are excepted from the confidentiality provision thereof.

17.     The Agreement provides that no party will engage in any conduct that is injurious to the other's reputation or interest or disparage the other. The Agreement also provides that, in response to requests for references concerning Dr. Blutreich, the Employer shall state that

> As a result of Lenox Hill Hospital's merger with North Shore - Long Island Jewish Health System and the closure of Lenox Hill Pathology, P.C. (the P.C."), a review of current staffing levels led to the decision not to renew Dr. Blutreich's contract with the Employer. ... So long as any requests for non-credentialing inquiries and/or requests for references are directed to the attention of Glenn Courounis, Vice President, Human Resources, Lenox Hill Hospital, Employer will provide a neutral reference for Employee, including only Employee's position, dates of employment and, if requested in writing, last salary.

18.     In the months following her departure from NSLIJHS, Dr. Blutreich applied to work at dozens of hospitals as well as the U.S. Air Force medical service and locum tenens (temporary physician placement) providers. Approximately a dozen times, she went through the interview process and was offered employment subject to a reference check, only to have the prospective employer suddenly break off contact.

19.     In or about early May 2012, *i.e.*, at or about the time Dr. Blutreich's counsel contacted Lenox Hill to complain of sexual harassment by Dr. Rodgers, Dr. Blutreich was approached by the head recruiter for Cancer Centers of America (CCA) and encouraged to apply for a position as an attending pathologist. Later that month, CCA flew her to Goodyear, Arizona

for a series of interviews with its current staff pathologist, surgeons and hospital administrators. Several weeks later, Dr. Blutreich contacted CCA to follow up and was told that CCA was no longer interested in her application.

20.     Upon information and belief, Dr. Blutreich was considered a leading candidate by CCA, until it checked her references. Upon information and belief, it was NSLIJHS's reference that thwarted Dr. Blutreich's application. Upon information and belief, NSLIJHS's reference did not conform to the language of the Agreement. Upon information and belief, NSLIJHS's reference was dishonest. Upon information and belief, the reason for the bad references is that NSLIJHS is and/or was retaliating against Dr. Blutreich for bringing a complaint of sexual harassment.

21.     On or about July 18, 2012, *i.e.*, the day Dr. Blutreich executed the Agreement resolving her complaint of sexual harassment and requiring NSLIJHS to proved references in the prescribed form, Dr. Blutreich sat for an interview with Dr. Mario Gonzalez of Lutheran Hospital ("Lutheran") in Brooklyn, New York. Dr. Gonzalez offered Dr. Blutreich a position pending reference checks. Dr. Blutreich expressed her interest in the position. When Dr. Blutreich phoned Lutheran's recruiter, Ms. Soti McGinley, several days later, Ms. McKinley told Dr. Blutreich that the position had been filled.

22.     Upon information and belief, Dr. Blutreich was considered a leading candidate by Lutheran, until it checked her references. Upon information and belief, it was NSLIJHS's reference that thwarted Dr. Blutreich's application. Upon information and belief, NSLIJHS's reference did not conform to the language of the Agreement. Upon information and belief, NSLIJHS's reference was dishonest. Upon information and belief, the reason for the bad

6

references is that NSLIJHS is and/or was retaliating against Dr. Blutreich for bringing a complaint of sexual harassment.

23.     On or about July 20, 2012 (*i.e.*, two days after execution of the Agreement resolving her complaint of sexual harassment and requiring NSLIJHS to provide references in the prescribed form),  Dr. Blutreich interviewed for a position as Director of the Blood Bank and Surgical Pathologist at St. Barnabas Medical Center ("St. Barnabas") in Livingston, New Jersey. She was given a written exam on surgical pathology and interviewed with all the pathologists in the department. She also interviewed and ate lunch with the Department Chairman, Dr. Selwyn Baptist. Dr. Baptist was cordial but informed Dr. Blutreich that there were applicants who had more experience than she did. Dr. Baptist subsequently told Dr. Blutreich that St. Barnabas had offered the position to another pathologist who had many more years experience. Approximately one month later, Dr. Blutreich learned that the more experienced pathologist had declined the position and that St. Barnabas was again advertising the position. On or about September 11, 2012, *i.e.*, six weeks after execution of the Agreement, Dr. Blutreich phoned Dr. Baptist and told him that she was still interested. Dr. Baptist responded to Dr. Blutreich's inquiry by saying that St. Barnabas has "absolutely no interest" in her application and hung up the phone.

24.     Upon information and belief, Dr. Blutreich was considered a leading candidate by St. Barnabas, until it checked her references. Upon information and belief, it was NSLIJHS's reference that thwarted Dr. Blutreich's application. Upon information and belief, NSLIJHS's reference did not conform to the language of the Agreement. Upon information and belief, NSLIJHS's reference was dishonest. Upon information and belief, the reason for the bad references is that NSLIJHS is and/or was retaliating against Dr. Blutreich for bringing a

complaint of sexual harassment.

25.    In or about August 2012, Dr. Blutreich was contacted by Dorothy Leiane Bellmore, a recruiter for Plantation Hospital (owned by HCA Healthcare) in Florida. Ms. Bellmore told Dr. Blutreich that her resume was impressive and the Hospital was seeking someone who had blood bank fellowship training and surgical pathology training. Plantation flew Dr. Blutreich to Florida, where, on or about August 17, 2012, she interviewed with the Pathologists, the Chief of Medical Staff, and the Director of Obstetrics. Dr Fiorella, who was head of the Department of Pathology and Laboratory Medicine, told Dr. Blutreich that he liked her very much and he would make a decision within two weeks. Dr. Blutreich then called to follow up, only to be told that Plantation Hospital/HCA Healthcare had chosen not to hire her since she only had two years experience. However, Plantation was aware that Dr. Blutreich had only two years' experience before they interviewed her.

26.    Upon information and belief, Dr. Blutreich was considered a leading candidate by Plantation Hospital/HCA Healthcare until it checked her references. Upon information and belief, it was NSLIJHS's reference that thwarted Dr. Blutreich's application. Upon information and belief, NSLIJHS's reference did not conform to the language of the Agreement. Upon information and belief, NSLIJHS's reference was dishonest. Upon information and belief, the reason for the bad references is that NSLIJHS is and/or was retaliating against Dr. Blutreich for bringing a complaint of sexual harassment.

27.    On or about August 22, 2012, Dr. Blutreich contacted Dr. Dise, the Chairman of Pathology at Morristown Memorial Hospital ("Morristown") in New Jersey about potential openings for an Attending Pathologist and was told to email her resume. She did so and was

8

invited to interview by telephone with Dr. Jory Magdison for a Staff Pathologist position. Several days thereafter, she attended a full day of interviews at Morristown. Dr. Magdison told Dr. Blutreich that Morristown would contact her references and be in touch soon about the position. Dr. Blutreich then called two follow up, only to be told that Morristown had changed its mind.

28.     Upon information and belief, Dr. Blutreich was considered a leading candidate by Morristown until it checked her references. Upon information and belief, it was NSLIJHS's reference that thwarted Dr. Blutreich's application. Upon information and belief, NSLIJHS's reference did not conform to the language of the Agreement. Upon information and belief, NSLIJHS's reference was dishonest. Upon information and belief, the only reason for the bad references is that NSLIJHS is and/or was retaliating against Dr. Blutreich for bringing a complaint of sexual harassment.

29.     In early October 2012, Dr. Blutreich spoke to Dr. King, one of the partners at University Pathologists ("UP"). Dr. King told Dr. Blutreich that there was an opening at one of UP's hospital locations in Rhode Island. On or about October 22, 2012, Dr. Blutreich attended a series of interviews in Rhode Island with the three partners of the practice: Dr. Thomas King, Dr. Jila Khorsand and Dr. Abby Maizel. Dr. Maizel, the owner/founder of the practice, held a separate two-hour interview with Dr. Blutreich. He told her that she had the training and qualifications that UP was seeking and that UP was going to have an opening following the planned dismissal of one of its current pathologists. Dr Maizel and Dr. Blutreich spoke at length about their common backgrounds and his research. Dr. Maizel asked Dr. Blutreich for permission to contact her references, which permission she granted. Dr. Maizel said if all went well, UP would invite Dr. Blutreich to return to Rhode Island for a second interview to see the hospital.

When Dr. Blutreich called to follow up, she was told that UP was interviewing. Approximately one week later, she received a letter stating that her application was under consideration. Approximately one week later, Dr. Blutreich e-mailed Dr. Maizel to follow up; she received no response.

30.     Upon information and belief, Dr. Blutreich was considered a leading candidate by UP until it checked her references. Upon information and belief, it was NSLIJHS's reference that thwarted Dr. Blutreich's application. Upon information and belief, NSLIJHS's reference did not conform to the language of the Agreement. Upon information and belief, NSLIJHS's reference was dishonest. Upon information and belief, the reason for the bad references is that NSLIJHS is and/or was retaliating against Dr. Blutreich for bringing a complaint of sexual harassment.

31.     In or about October 2012, Dr. Blutreich had a telephone interview with Col. (Dr.) Pelletier, the Head Pathologist of the United States Air Force. Col. Pelletier told Dr. Blutreich that she, along with two other pathologists/blood bank physicians, would be running the blood bank at the Air Force's main hospital in San Antonio, Texas as well as signing out breast pathology surgical cases (since Dr. Blutreich had requested both anatomic and clinical pathology responsibilities). She then attended an in-person interview at the New York Air Force recruitment office. Dr. Blutreich was interviewed by M. Sgt. Giatinno and M. Sgt. Daniels. The interview went well; Dr. Blutreich was told that an official Air Force physical and an another interview with Col. Dr. Pelletier would be scheduled in two weeks. Dr. Blutreich was given a 100-page application to complete in order to obtain military clearance. During the interview, Dr. Blutreich was informed that the Air Force would begin contacting all of her prior employers, as part of a background check. If all went according to schedule, Dr. Blutreich would be sent to

Arkansas for initial training and begin working in San Antonio no later than April or May 2013. She then received a call from M. Sgt Daniels that the Air Force could not hire her since she did not have blood bank board certification. He said he could not understand what happened since the Air Force was aware from the onset that Dr. Blutreich is board certified in Anatomic and Clinical Pathology, board eligible for Blood Banking and accordingly authorized to be a blood bank director. He said putting Dr. Blutreich through two interviews was very unusual and he was surprised. Dr. Blutreich e-mailed Col. Dr. Pelletier and asked him what had happened. Col. Dr. Pelletier said that it was beyond his control and that someone higher up had made this decision and he could not reverse it.

32.     Upon information and belief, Dr. Blutreich was considered a leading candidate by the Air Force, until it checked her references. Upon information and belief, it was NSLIJHS's reference that thwarted Dr. Blutreich's application. Upon information and belief, NSLIJHS's reference did not conform to the language of the Agreement. Upon information and belief, NSLIJHS's reference was dishonest. Upon information and belief, the reason for the bad references is that NSLIJHS is and/or was retaliating against Dr. Blutreich for bringing a complaint of sexual harassment.

33.     Dr. Blutreich then learned of an unfilled spot in the Beth Israel Hematopathology fellowship program. Upon information and belief, when a fellowship spot is unfilled, residency and fellowship programs act quickly to fill the spot before the beginning of the academic year in July lest they lose funding for that fellowship spot. She was recommended for the fellowship by Dr. Beverly Wang, the Vice Chair of Pathology at Beth Israel, who had trained Dr. Blutreich as a resident and fellow at New York University, and by Dr. Antonio Macias, a cytopathologist at St.

Luke's-Roosevelt (part of the Continuum Healthcare Network that includes Beth Israel), who had been a pathology resident at Long Island Jewish Hospital with Dr. Blutreich. On or about March 11, 2013, Dr. Blutreich interviewed at Beth Israel Medical Center (Beth Israel) for the Hematopathology Fellowship. Dr. Blutreich interviewed with Dr. Vijay Shah, the head of Hematopathology, Dr Vijay Shah, the head of Immunohistochemistry lab, Dr. Violette Ghali, the head of the Blood Bank and Dr. Friedman, the head of the Blood Bank. Dr. Friedman reviewed Dr. Blutreich's curriculum vitae and asked her whether she knew that Dr. Rodgers (the individual defendant herein) was then at New York Hospital of Queens. At the end of the interview, Dr. Friedman gave Dr. Blutreich his cell phone number and email address in case she had further questions about the fellowship. Upon information and belief, Dr. Friedman at that time held a part-time position at New York. Hospital of Queens. Two days later, Dr. Friedman began sending emails advertising the Hematopathology fellowship position once again.

34. Upon information and belief, Dr. Blutreich was considered a leading candidate by the Beth Israel for the Hematopathology fellowship, until it checked her references. Upon information and belief, it was NSLIJHS's reference, and/or Dr. Rodgers' reference, that thwarted Dr. Blutreich's application. Upon information and belief, NSLIJHS's reference did not conform to the language of the Agreement. Upon information and belief, NSLIJHS's reference was dishonest. Upon information and belief, the reason for the bad references is that NSLIJHS and/or Dr. Rodgers are and/or were retaliating against Dr. Blutreich for bringing a complaint of sexual harassment.

35. On or about May 9, 2013, Dr. Blutreich attended an interview at CDx Diagnostics ("CDx") in  Suffern, New York. She was interviewed by Dr. Klaus Schreiber, the Medical

Director of CDx, as well as Mr. Mayer Pessin, CDx Vice President for Finance and Operations, a

Dr. Frist, and Madelyn Scrivanich, a representative of CDx Human Resources. During the

interview, Mr. Pessin represented that CDx intended to hire four staff pathologists. During the

interview, Dr. Schreiber and Dr. Blutreich discussed implementation of a new computer

pathology slide screening system at CDx as well as pathologist compensation. Finally, Dr.

Schreiber asked Dr. Blutreich if she was able to start work the following week, that he would

contact one or two references as a "formality" and that a work schedule would be set up for her.

Several days thereafter, Dr. Blutreich phoned Dr. Schreiber. Dr. Schreiber told Dr. Blutreich that

he had changed his mind about offering her employment.

36.     Upon information and belief, Dr. Blutreich was considered a leading candidate by

CDx, until it checked her references. Upon information and belief, it was NSLIJHS's reference

that thwarted Dr. Blutreich's application. Upon information and belief, NSLIJHS's reference did

not conform to the language of the Agreement. Upon information and belief, NSLIJHS's

reference was dishonest. Upon information and belief, the reason for the bad references is that

NSLIJHS is and/or was retaliating against Dr. Blutreich for bringing a complaint of sexual

harassment.

37.     Prior to her employment at Lenox Hill/NSLIJHS, Dr. Blutreich had always

received good references from employers. In fact, in February 2012, NSLIJHS itself, which is

well known to be a top-quality hospital and highly selective about its employees, extended her an

offer of employment for two years.

38.     Since there was no other explanation for the withdrawn offers of employment, Dr.

Blutreich had little choice but to engage a reference-checking service. Unfortunately, the

reference checker confirmed her suspicion that NSLIJHS and Dr. Rodgers had provided false references to prospective employers:

a.   On or about November 15, 2012, a reference checker phoned Dr. Rodgers, who stated, in essence, that Dr. Blutreich is the kind of "problem" employee who sues her employer:

> I can tell you that she left in good standing however due to a non-disclosure agreement related to a settlement agreement regarding her departure I am not in a position to comment. Our legal counsel has advised us not discuss her employment at Lenox Hill Hospital in any way. I can also tell you that Dr. Blutreich should be directing any employment related inquiries to our Personnel Department – which was not at our request, but rather at the specific request of her attorneys. I'm sorry, I'm not in a position to help you more, but I cannot comment further.

b.   Also on or about November 15, 2012, the reference checker spoke to Dr. Samuel Wahl, then the Director (now, upon information and belief, the Acting Chairman) of Surgical Pathology at Lenox Hill. Dr. Wahl stated that

> there were some personality issues I think and as a result her interpersonal skills deteriorated over time ... I would recommend her, but only if she had an understanding colleague ... our chairman elected not to renew her contract.

Dr. Wahl also rated Dr. Blutreich's professionalism and personal qualities on a scale of 1 (low) to 5 (high). He gave her a 2 on "ability to handle conflict," and 3s on "ability to be fair and objective," "relationship building" and "overall performance."

14

c.      That same day, the reference checker spoke to Elana Opher, M.D., Director of the

Lenox Hill Cytology Department. Dr. Opher gave Dr. Blutreich a 2 in

"interpersonal skills."

d.      On or about November 21, 2012, Dr. Blutreich's reference checker attempted to

contact Mr. Courounis of the Lenox Hill Human Resources Department as

provided in the Agreement. When the reference checker phoned Human

Resources, he was informed that Mr. Courounis was no longer with the Hospital.

He was then directed by "Olivia" of the Human Resources Department to call a

telephone number, give Dr. Blutreich's social security number and authorize

payment of a fee, which would obtain confirmation of Dr. Blutreich's title and

dates of employment.

39.      Upon information and belief, the Hospital's Department of Medical Affairs,

which completes credentials paperwork in response to inquiries from hospitals, listed Dr.

Blutreich in PeopleSoft as having "resigned" at about that time.

40.      In late November or early December 2012, Dr. Blutreich phoned Emily

Weisenbach, having learned that she had replaced Glenn Courounis. Ms. Weisenbach reported

that NSLIJHS counsel's office had informed all of HR and Medical Affairs that the Agreement

requires a statement that a merger was the cause of Dr. Blutreich's separation from employment.

Otherwise stated, the relevant persons learned of their duties pursuant to the Agreement some

five months after the document had been executed. At that point, however, significant damage

had been done to Dr. Blutreich's prospects for employment.

41.      Dr. Blutreich also sought employment through locum tenens (physician temporary

employment) agencies, including Comp Health Locum Tenens in Oregon. Comp Health assigned Dr. Blutreich to recruiter Jeff Nuber for several months in mid-2012 to locate temporary and/or permanent positions in Pathology throughout the United States. Dr. Blutreich obtained a telephone interview with a Comp Health client, Asante Health System/Rogue Valley Medical Center, and was offered a contract for a two-month position as a Pathologist that could become permanent. Both CompHealth and Rogue Valley Medical Center were in the process of credentialing Dr. Blutreich separately, when the contract was cancelled by Rogue Valley Medical Center without explanation. CompHealth had also paid for Dr. Blutreich to obtain an Oregon Medical License so that she could work for this client of Comp Health. Neither CompHealth nor Rogue Valley Medical Center offered Dr. Blutreich any explanation for the cancellation. Mr. Nuber, the recruiter, said that he did not know what happened. Dr. Blutreich phoned the Vice President of Operations at Rogue Valley Medical Center (Jose Romo, who had interviewed her) and left two messages asking to speak with him, but he did not return the calls. Angela Cavaness, CompHealth credentialing expert, informed Dr. Blutreich that she had requested credentialing paperwork from all of her employers, but that Lenox Hill (and only Lenox Hill) had failed to respond for several months.

42.     Upon information and belief, Dr. Blutreich was considered a leading candidate by CompHealth and/or Asante Health Systems/Rogue Valley Medical Center, until they attempted to credential her. Upon information and belief, it was NSLIJHS's failure to timely provide the credentialing paperwork that caused Dr. Blutreich's contract with Asante Health Systems/Rogue Valley Medical Center to be cancelled. Upon information and belief, the reason for the failure to timely provide credentialing paperwork was that NSLIJHS is and/or was retaliating against Dr.

16

Blutreich for bringing a complaint of sexual harassment.

43.     Between April 2012 and February 2013, Dr. Blutreich sought employment with Weatherby Locums , which provides physicians to hospitals on a temporary basis. Weatherby credentialing expert Lisa McCabe informed Dr. Blutreich that it took close to three months to obtain credentialing verification from Lenox Hill Hospital. Upon information and belief, Dr. Blutreich was considered a leading candidate for placement  by Weatherby Locums, until it attempted to credential her. Upon information and belief, it was NSLIJHS's failure to timely provide credentialing paperwork that prevented Dr. Blutreich from being placed for employment by Weatherby Locums. Upon information and belief, the only reason for the failure to provide timely credentials is that NSLIJHS is and/or was retaliating against Dr. Blutreich for bringing a complaint of sexual harassment.

44.     Following multiple requests by potential employers for credentialing verification, Dr. Blutreich discovered that Glenn Courounis had left Lenox Hill's employment. Approximately two months later, NSLIJHS identified Emily Weisenbach as the Human Resources official responsible for references. However, NSLIJHS failed for five weeks to inform Dr. Blutreich that Ms. Weisenbach had departed on maternity leave. During this time, upon information and belief, requests for references were directed to a person(s) unaware of the applicable requirements of the Agreement. Companies and hospitals requesting references were referred by the Human Resources department at NSLIJ to an automated phone service which required payment in order to receive information on Dr. Blutreich. This automated phone service did not provide the reason for Dr. Blutreich's separation from employment.

45.     Dr. Blutreich learned in January 2013 that licensing coordinators of two locum

tenens (temporary medical staffing) companies, CompHealth and Weatherby Locums, had been

trying without success since November 1, 2012, to credential her in order to send her on

temporary assignments to work as a pathologist throughout the country. NSLIJHS delayed

sending out the credentialing paperwork from November 1 until January 24. This delay hindered

Dr. Blutreich from obtaining employment. Locum tenens/temporary positions are time-sensitive

and delays of this kind mean that the positions are no longer available. These credentials

verifications normally take approximately two to four weeks.

46.     Defendants' failures to provide timely and/or accurate credentialing information

to the hospitals and other facilities at which she was a candidate for employment (not including

the reference checker) was in bad faith.

47.     On or about January 23, 2013, Dr. Blutreich, through counsel, contacted

defendants in an unsuccessful attempt to seek relief for the foregoing. On or about March 6,

2013, she filed a charge of discrimination at the EEOC.

48.     On or about April 15, 2013, in response to an inquiry from Sterling Information

Systems (which was conducting a background check for a position at TMAC/Pfizer), NSLIJHS

reported that Dr. Blutreich was an Assistant Pathologist at Lenox Hill from 12/18/2011 until

4/19/2012. In fact, and as she had reported to Sterling Information Systems, Dr. Blutreich was

employed as an Associate Pathologist from July 2010 until April 2012.

49.     NSLIJHS's report to Sterling Information Systems gives the impression that Dr.

Blutreich had grossly misrepresented her credentials. A pathologist assistant is a physician's

assistant and holds a four-year undergraduate degree, whereas Dr. Blutreich has completed four

years of college (Barnard College), four years of medical school (Sackler School of Medicine),

18

four years of residency training (internship in pediatrics at Maimonides Medical Center, four

years of pathology residency at New York University and Long Island Jewish Hospital), two

years of fellowship training in surgical pathology at NYU Medical Center and blood

banking/transfusion medicine at the New York Blood Center) and is board-certified in Anatomic

and Clinical Pathology). NSLIJ also failed to provide salary information to Sterling Information

Systems, as provided in the Separation Agreement. In summary, NSLIJ misrepresented Dr.

Blutreich's title and credentials, misrepresented her duration of employment, failed to disclose

her starting and ending salary and the reason for her separation from NSLIJ, as was specified in

the Separation Agreement. Consequently, upon information and belief, an unknown number of

hospitals and corporations regard Dr. Blutreich as a physician's assistant posing as a medical

doctor.

      50.    NSLIJ repeatedly ratified the retaliation and/or breach of contract detailed in this

Complaint. At every juncture, when the plaintiff discovered issues related to receiving references

from NSLIJ, Dr. Blutreich's counsel repeatedly contacted NSLIJ's counsel to remedy the

situation, as Dr. Blutreich was continually losing employment opportunities. However, NSLIJ

failed and refused to remedy this situation. Specifically,

        a.     On January 23, 2013, Dr. Blutreich's counsel wrote Elizabeth Dore Napoli,

               NSLIJHS's counsel, that Angela Cavaness, Licensing Coordinator of

               CompHealth, a locum tenens provider in Oregon, had been trying without success

               since December 10, 2012, to contact "Millie" of the Lenox Hill Medical Affairs

               office in an attempt to obtain Dr. Blutreich's credentials;

        b.     On May 3, 2013, Dr. Blutreich's counsel provided NSLIJHS's counsel a copy of

the relevant page of a confidential background screening report issued by Sterling

Information Systems of Rocklin, California on or about April 15, 2013 referenced

in Paragraph 28. The left-hand column of the document shows accurate

information,  provided by Dr. Blutreich. The right-hand column shows

information provided by the Verify Job System. Dr. Blutreich said that she was

employed as a Pathologist at Lenox Hill from 7/2010 until 4/2012. Verify reported

that Dr. Blutreich was an Assistant Pathologist from 12/18/2011 until 4/19/2012.

The Lenox Hill reference-check is flagged "!Consider" in red ink;

c.      On May 6, 2013, Dr. Blutreich's counsel wrote NSLIJHS's counsel that Sterling's

representative had tried twice to contact Emily Weisenbach by phone. Having had

no response to his phone messages, he called the human resources number in his

files and was directed to NSLIJHS's third-party vendor. Dr. Blutreich's counsel

wrote that

>   Sterling will be conducting additional background checks
>   later this week. Accordingly, I would appreciate it if you
>   would expedite your inquiries into Dr. Blutreich's job title
>   and dates of employment. To that end, a copy of my client's
>   employment agreement is attached. We are also providing
>   Sterling's customer service fax number, (800) 943-4572, in
>   the hope that Pfizer has not yet finalized its decision;

d.      On May 8, 2013, Dr. Blutreich's counsel wrote NSLIJHS's counsel that

>   Further to my letter of May 6, Dr. Blutreich now reports
>   that she has spent a great deal of time on the phone with
>   Sterling explaining []discrepancies and misinformation.
>   Unfortunately, Sterling refuses to correct the information
>   unless either North Shore-LIJ contacts the company directly
>   or the Medical Affairs Company/Pfizer reopens her file
>   (which it refuses to do);

e.   On May 13, 2013, Dr. Blutreich's counsel wrote NSLIJHS's counsel that

> Dr. Blutreich reports that, incident to applying for another position late last week, she completed a background check form which required a contact person at Lenox Hill. She had someone call Emily Weisenbach's phone number, (212) 434-2681. There is a recording on her extension stating that she has been on maternity leave since April 10, 2013 (but that she might have limited access to e-mail). Her message directs the caller to the main HR number or to her colleague, whose name is unclear, at extension 2826;

f.   On May 13, 2013, Dr. Blutreich's counsel wrote to NSLIJHS's counsel to reiterate that Verifyjobs had reported to Sterling that Dr. Blutreich was an Assistant Pathologist and that

> [t]he institutions to which Dr. Blutreich applied, particularly such non-hospitals as Pfizer, hearing the "assistant" designation from Verifyjobs, will wrongly conclude that she is a physician assistant posing as a medical doctor, *i.e.*, is committing fraud;

g.   Later that day, Dr. Blutreich's counsel wrote to NSLIJHS's counsel that

> Dr. Blutreich's application at South Nassau Communities Hospital is pending. The person in Human Resources who interviewed her and had her sign an authorization for a background check is Jessica Reilly, (516) 632-3930. It may be that a timely intervention to correct information on file would avoid a baseless rejection by that hospital. In addition, as discussed in my letter of May 6, Sterling's customer service fax number is (800) 943-4572;

h.   On May 23, 2013, Dr. Blutreich's counsel wrote NSLIJHS's counsel that

> On May 14, 2013, you wrote me that requests for references regarding Dr. Blutreich should, during Emily Weisenbach's leave of absence, be directed to Maxine Cenac at (212) 484-2821. I am informed, however, that that phone is not answered and that calls are not directed to voicemail. Please verify the number;

21

i.      On June 10, 2013, Dr. Blutreich's counsel wrote NSLIJHS's counsel that

> I wrote you on May 23, 2013, to advise that the phone number you had given me for Maxine Cenac (to whom requests for reference should be directed in Dr. Blutreich's absence) was not in service. Later that day, Michelle Iglesias of your office emailed me the correct number.
>
> Subsequently, we are informed that potential employers, who phoned Ms. Cenac (at the corrected number) to obtain references and were told to fax their requests, have not received responses to their faxes, in some cases for over 14 days.
>
> Moreover, I have not had a response to my letter of May 14, 2013, requesting your office's intervention to correct erroneous information possibly given to South Nassau Communities Hospital.

51.     NSLIJHS itself is aware that accurate references and credentialing information are of paramount importance and that false or inaccurate references are a basis for termination or refusal to hire. It communicates that importance to physicians applying to NSLIJHS for employment. When it extended Dr. Blutreich an offer of employment as a full-time Pathologist by letter dated February 27, 2012, it appended to that offer the North Shore - Long Island Jewish Medical Group Physician Manual, which provides in part that

> NSLIJ relies upon the accuracy and completeness of all information provided by candidates as part of the process to become a Medical Group Physician and of all information presented throughout the hiring process and during employment. Any misrepresentations, falsifications, or material omissions in any of this information or data may result in exclusion of the individual from further consideration for employment as a Medical Group Physician, if applicable or, termination of employment as a Medical Group Physician.

52.     NSLIJHS was, at all relevant times, also aware that formalities incident to the credentialing process cannot be waived. Accordingly, at or about the time that NSLIJHS

extended Dr. Blutreich an offer of employment, it required that she provide facsimiles of all of her diplomas and certifications to NSLIJHS's credentialing office, including the diploma issued by LIJ (Long Island Jewish Hospital) itself, even though she had done so in connection with her employment at Lenox Hill Hospital, which was acquired by NSLIJHS.

53.     On February 27, 2012, NSLIJHS was not yet aware that Dr. Blutreich had complained of sexual harassment.

54.     Subsequent to February 27, 2012, NSLIJHS conveyed inaccurate and/or untimely employment references to hospitals and other health care employers.

55.     Defendants' failure and refusal to timely provide accurate information to Dr. Blutreich's potential employers as provided in the Agreement, notwithstanding its actual knowledge of the falsity of its references, its ability to correct inaccurate references and the urgent requirement that it do so, breached its contractual covenant of good faith and fair dealing.

56.     Defendants' actions were intentional and in reckless disregard of the health and well being of the plaintiff.  As a result of these acts, the plaintiff has suffered grievous, extensive and continuing damages, including, but not limited to, pain and suffering, humiliation and embarrassment, lost wages and benefits.


**COUNT I**

57.     Plaintiff incorporates by reference Paragraphs 1 through 56 of this Complaint as though the same were set forth fully herein.

58.     NSLIJHS retaliated against plaintiff in violation of Title VII.

23

**COUNT II**

59.    Plaintiff incorporates by reference Paragraphs 1 through 58 of this Complaint as though the same were set forth fully herein.

60.    NSLIJHS retaliated against plaintiff in violation of the New York City Human Rights Law.

61.    Dr. Rodgers aided and abetted NSLIJHS's retaliation, and accordingly retaliated against plaintiff in violation of the New York City Human Rights Law.

**COUNT III**

62.    Plaintiff incorporates by reference Paragraphs 1 through 61 of this Complaint as though the same were set forth fully herein.

63.    NSLIJHS, having failed to provide references in response to properly directed requests by potential employers as provided in the Agreement, is liable for breach of contract.

64.    NSLIJHS, having engaged in conduct that is injurious to Dr. Blutreich's reputation and/or disparages her, is liable for breach of contract.

65.    The Agreement, like all New York contracts, contains an implied covenant of good faith and fair dealing. NSLIJHS, having failed to inform Dr. Blutreich for five weeks that Glenn Courounis had been replaced by Emily Weisenbach, breached that covenant and is accordingly liable for breach of contract. NSLIJHS, having failed to provide a Human Resources contact for five weeks during Emily Weisenbach's maternity leave, similarly breached its covenant of good faith and fair dealing and is accordingly liable for breach of contract.

66.    The Agreement provided for NSLIJHS to provide a neutral reference for Dr.

Blutreich, stating only her position, dates of employment and, if requested in writing, last salary. NSLIJHS had actual knowledge that it had falsely informed Sterling Information Systems, which was conducting a background check for TMAC/Pfizer, that Dr. Blutreich was an assistant pathologist (rather than a pathologist) and was employed by Lenox Hill from December 2011 until April 2012 (rather than from July 2010 until April 2012). It nevertheless refused to correct the inaccurate reference. Accordingly, it breached its covenant of good faith and fair dealing and is liable for breach of contract.

67.     NSLIJHS, having acted in bad faith by failing to provide timely and/or accurate credentialing information, including the information required to be furnished under N.Y. Public Health Law § 2805-k (1)(a)-(f), to hospitals and other facilities at which Dr. Blutreich was a candidate for employment, is liable for breach of contract.


**COUNT IV**

68.     Plaintiff incorporates by reference Paragraphs 1 through 67 of this Complaint as though the same were set forth fully herein.

69.     NSLIJHS was obliged by duly executed contract to provide employment references conforming to the Agreement. Its failure to do so was wrongful.

70.     NSLIJHS had actual knowledge that Dr. Blutreich was a pathologist, rather than an assistant pathologist and of her true dates of employment. It nevertheless provided prospective employers objectively false information, *i.e.*, was dishonest.

71.     Defendants' failure to provide timely credentialing information to prospective employers impaired her ability to secure employment.

72.     Defendants acted for the sole purpose of harming Dr. Blutreich and/or used dishonest, unfair or improper means.

73.     Under the law of the Second Circuit, where a plaintiff physician has the opportunity to work at a third-party hospital, but defendants' substantial delay in providing credentialing information prevents the plaintiff from obtaining the position sought, a jury may reasonably conclude that defendants used dishonest, unfair, or improper means. *Purgess v. Sharrock*, 33 F.3d 134, 142 (2d Cir. 1994).

74.     Defendants are accordingly liable for tortious interference with prospective economic advantage.


## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court grant the following relief:

A.  Declare NSLIJHS's conduct complained of herein to be in violation of the plaintiff's rights as secured by Title VII, Title 8 and the common law of New York;

B.     Declare William Rodgers' conduct complained of herein to be in violation of the plaintiff's rights as secured by Title 8 and the common law of New York;

C.  Grant a permanent injunction enjoining NSLIJHS and its officers, management personnel, employees, agents, attorneys, successors and assigns and those acting in concert therewith from any conduct violating the rights of the plaintiff as secured by Title VII, Title 8 and the common law of New York;

D.  Grant a permanent injunction enjoining William Rodgers from any conduct violating the rights of the plaintiff as secured by Title 8 and the common law of New York;

26

E.  Order defendants to make the plaintiff whole by providing appropriate lost earnings and benefits, with pre-judgment interest, and other affirmative relief including, but not limited to, front pay;

F.  Award the plaintiff compensatory damages to be determined by the jury at the time of trial;

G.  Award the plaintiff punitive damages to be determined by the jury at the time of trial;

H.  Award the plaintiff reasonable attorneys' fees and costs, including the fees and costs of experts, incurred in prosecuting this action;  and

I.  Grant such further relief as the Court deems necessary and proper.


**JURY TRIAL DEMANDED**

The Plaintiff requests a jury trial on all questions of fact raised by the Complaint.

Dated:  New York, New York
         May 1, 2015


                                        Respectfully submitted,

                                        LEVY DAVIS & MAHER, LLP

                                        By:  _____/s/_____

                                        Jonathan A. Bernstein (JB 4053)
                                        Attorneys for Plaintiff
                                        39 Broadway, Suite 1620
                                        New York, New York 10006
                                        (212) 371-0033
                                        jbernstein@levydavis.com

To:     Peter D. Stergios, Esq.

27

McCarter & English, LLP
245 Park Avenue, 27th Floor
New York, New York 10167
(212) 609-6848
pstergios@mccarter.com