UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------X
AHNA BLUTREICH,

                         Plaintiff,

                                          13-CV-8583 (DAB)
                                          <u>MEMORANDUM & ORDER</u>

          v.

NORTH SHORE – LONG ISLAND JEWISH HEALTH
SYSTEM, INC., and WILLIAM RODGERS

                         Defendants.
--------------------------------------------X
DEBORAH A. BATTS, United States District Judge.

     Plaintiff Ahna Blutreich, M.D. ("Plaintiff" or "Dr.
Blutreich") filed suit against Defendants North Shore – Long
Island Jewish Health System, Inc. ("North Shore") and William
Rodgers, M.D. ("Dr. Rodgers") (collectively "Defendants") for
retaliation under Title VII of the Civil Rights Act of 1964
("Title VII") and New York City Human Rights Law ("NYCHRL"),
breach of contract, and tortious interference with prospective
economic advantage. Before the Court is Defendants' Motion to
Dismiss Plaintiff's Second Amended Complaint. For the following
reasons, Defendants' Motion to Dismiss is DENIED.

I.   BACKGROUND

   A.   Factual Background

   For the purpose of this Motion, familiarity with underlying facts is assumed, and the facts as alleged in Plaintiff's Second Amended Complaint are assumed true.[1]  The facts are recited here only insofar as they are relevant to resolving the instant Motion.

   Lenox Hill Pathology, P.C. ("Lenox Hill Pathology"), a part of Lenox Hill Hospital ("the Hospital"), employed Plaintiff as an Associate Pathologist from July 2010 to April 2012.  (Sec. Am. Compl. ¶¶ 14, 48.)  Plaintiff claims that during that period, she was subjected to sexual harassment from Dr. Rodgers, who was the head of Lenox Hill Pathology and her supervisor. (Id. ¶¶ 14, 15.)  Plaintiff alleges that she was fired without cause in April 2012 when she finally asked Dr. Rodgers to stop the harassment.  (Id.)  Plaintiff's then-attorney negotiated an out-of-court settlement with Lenox Hill. (Id.)

   In July 2012, Lenox Hill Hospital, North Shore, and Plaintiff signed an Agreement and General Release (the

_____

[1] For a detailed recitation of the facts, as alleged in Plaintiff's Amended Complaint, see the Court's Memorandum and Order dated April 2, 2015. Plaintiff alleges additional facts in her Second Amended Complaint, as outlined below.

2

"Agreement"), which confirmed the termination of her employment.[2] (Id. ¶ 16.) Pursuant to the Agreement, no party would "engage in any conduct that [was] injurious to the other's reputation or interest or disparage the other." (Id.; see Affirmation of Christina M. Schmid in Support of Defendants' Motion to Dismiss the Second Amended Complaint ("Schmid Aff."), Ex. 4, ¶ 17(c).) North Shore was to respond to all credentialing inquiries using the following language:

> Dr. Blutreich was first granted privileges at Lenox Hill Hospital in 2010.  As a result of Lenox Hill Hospital's merger with North Shore – Long Island Jewish Health System and the closure of Lenox Hill Pathology, P.C. (the "P.C."), a review of current staffing levels led to the decision not to renew Dr. Blutreich's contract with the Employer.

(Id. ¶ 17; Schmid Aff., Ex. 4, ¶ 18(a).)

    In addition, the Agreement provided that:

> So long as any requests for non-credentialing inquiries and/or requests for references (sic) are directed to the attention of Glenn Courounis, Vice President, Human Resources, Lenox Hill Hospital, Employer will provide a neutral reference for [Plaintiff], including only [Plaintiff's] position, dates of employment and, if requested in writing, last salary.

(Id.; Schmid Aff., Ex. 4, ¶ 18(b).)

    Plaintiff alleges that in the months following her departure from North Shore, she sought out other employment.

---

[2] At the time of the Agreement, North Shore was in the process of acquiring Lenox Hill Hospital.  (Id. ¶ 2.)

She alleges that she applied to dozens of hospitals, and went through the interview process with approximately twelve potential employers, "only to have the prospective employer suddenly break off contact" after a reference check with Defendants. (Id. ¶ 18.)[3]  Further, Plaintiff hired a reference checker to investigate whether Defendants were giving references in accordance with the Agreement.  Plaintiff alleges that in November 2012, her reference checker spoke with three doctors, including Defendant Rodgers, who all gave non-conforming references to her reference checker. (Id. ¶ 38.)

Plaintiff's Second Amended Complaint contains additional allegations regarding the nature of the interview process with potential employers and her progress with each potential employer. For example, Plaintiff alleges that on or about July 18, 2012, the day Dr. Blutreich executed the Agreement resolving her sexual harassment claims, Plaintiff interviewed with Dr. Mario Gonzalez of Lutheran Hospital in Brooklyn, New York. Plaintiff alleges that Dr. Gonzalez offered her a position pending reference checks.  Plaintiff claims that when she called Lutheran's recruiter several days later to inquire about her

---

[3] Plaintiff's First Amended Complaint listed the potential employers with whom she interviewed, but contained no additional details regarding the application process.  (Am. Compl. ¶¶ 19, 25.)

application, she was told the position had been filled.  (Id. ¶ 21.)

In addition, Plaintiff alleges that on or about July 20, 2012, Plaintiff interviewed for a position at St. Barnabas Medical Center in Livingston, New Jersey.  After her interviews with all of the pathologists in the department and a written exam, she interviewed with Dr. Selwyn Baptist, the Department Chairman.  Dr. Baptist subsequently told Plaintiff that St. Barnabas had decided to hire a person with more experience than she had.  One month later, Plaintiff learned that the more experienced applicant had declined the position.  Plaintiff called Dr. Baptist to reiterate her interest, and was told that St. Barnabas had "absolutely no interest" in her application. (Id. ¶ 23.)

Further, Plaintiff alleges that she was contacted by a recruiter for Plantation Hospital in Florida.  The recruiter told Plaintiff that her resume was impressive. On August 17, 2012, Plaintiff flew to Florida and interviewed with pathologists, the Chief of Medical Staff, the Director of Obstetrics, and the head of the Department of Pathology and Laboratory Medicine, Dr. Fiorella.  Dr. Fiorella told Plaintiff that he liked her very much and would make a decision within two weeks.  When Plaintiff followed up, she was told that Plantation had decided not to hire her because she had only two years'

experience, information Plaintiff claims Plantation knew when she interviewed.  (Id. ¶ 25.)

Plaintiff also alleges that in October 2012, she made it through a series of interviews with University Pathologists ("UP") in Rhode Island. Plaintiff alleges that the owner/founder of UP, Dr. Abby Maizel, informed her that she had the training and qualifications they were seeking, and asked permission to contact her references.  Dr. Maizel indicated that UP would invite her for a second interview at the hospital "if all went well" with her references.  Plaintiff followed up on multiple occasions, and was either told the application process was ongoing, or received no response.  (Id. ¶ 29.)

In October 2012, Plaintiff also interviewed for a pathology position at the United States Air Force's main hospital in San Antonio, Texas.  After telephone and in-person interviews, Plaintiff completed a 100-page application required for military clearance.  She was informed that the Air Force would begin contacting her prior employers as part of the background check, and that if all went according to schedule, she would be sent to initial training and would begin work in April or May 2013.  She was then informed that she could not be hired since she did not have blood bank certification, a certification not required for the position, and a fact which the Air Force knew prior to her interviews.  (Id. ¶ 31.)

6

Plaintiff also alleges that in March 2013, she applied for a spot in the Beth Israel Hematopathology fellowship program, based on the recommendations of two doctors with whom she had previously worked. Plaintiff alleges that Dr. Friedman, the head of the blood bank, reviewed her curriculum vitae and asked if she knew that Dr. Rodgers was then working at the New York Hospital of Queens. Plaintiff alleges that at the time of the interview, Dr. Friedman also held a part-time position at the New York Hospital of Queens. Two days after the interview, Dr. Friedman continued to send emails advertising the fellowship. Plaintiff was never offered the fellowship position. (<u>Id.</u> ¶ 33.)

As a final example, Plaintiff alleges that in May 2013, after interviewing with CDx Diagnostics in Suffern, New York, she was asked if she could start the following week pending a reference check. The interviewing doctor indicated that the reference check was a "formality" and that a schedule would be set up for her. Plaintiff alleges that several days later, the interviewer told Plaintiff he had changed his mind about offering her employment. (<u>Id.</u> ¶ 35.)

Plaintiff also claims that she sought work through at least two physician temporary employment agencies. (<u>Id.</u> ¶¶ 41, 43.) She claims that both agencies sought and were unable to obtain credentialing information about Plaintiff from North Shore for

7

several months.  (Id. ¶¶ 41-46.)  Plaintiff further asserts that North Shore's failure to provide timely and accurate information about her to potential employers was in bad faith. (Id. ¶ 46.)

Plaintiff alleges that, upon information and belief, she was considered a leading candidate for these and other positions prior to her reference check, and that Defendants' negative references or delayed responses to inquiries thwarted her employment prospects.  Plaintiff claims that she had always received good references before, and that North Shore itself had offered her a two-year position in February 2012.  (Id. ¶ 37.)

Plaintiff claims that Defendants' actions were intentional and in reckless disregard for her health and well-being.  (Id. ¶ 56.)  She further alleges that as a result of Defendants' actions, she experienced pain and suffering, humiliation and embarrassment, and lost wages and benefits.  (Id.)


B.   Procedural History

On December 3, 2013, Plaintiff filed her initial Complaint alleging four causes of action – retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), retaliation under the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq. ("NYCHRL"), breach of contract, and tortious interference with prospective economic advantage. On February 3, 2014, Defendants moved to dismiss

8

pursuant to Fed. Rule Civ. P. 12(b)(6) for failure to state a claim. On February 25, 2014, in lieu of opposing the Motion to Dismiss, Plaintiff filed an Amended Complaint.

On March 12, 2014, Defendants moved to dismiss Plaintiff's Amended Complaint. On April 2, 2015, this Court granted Defendants' Motion to Dismiss the Title VII retaliation claim without prejudice, finding that Plaintiff failed to plead sufficient adverse actions on the part of Defendants, as well as causation between Plaintiff's protected activity and such adverse actions, to state a claim for retaliation.  The Court also granted with prejudice Defendants' Motion to Dismiss the breach of contract claim as it related to Dr. Rodgers' and Dr. Wahl's non-conforming responses to Plaintiff's reference checker, and granted without prejudice Plaintiff's breach of contract claim relating to credentialing requests. Finally, the Court granted without prejudice Defendants' Motion to Dismiss the tortious interference with prospective economic advantage claim on the basis that Plaintiff did not allege sufficient malice or wrongful means. The Court denied Defendants' Motion to Dismiss the retaliation claim under NYCHRL in light of the more liberal standards for retaliation under the NYCHRL.

On May 1, 2015, Plaintiff filed a Second Amended Complaint, again asserting retaliation claims under Title VII and NYCHRL, as well as state law claims of breach of contract and tortious

interference with prospective economic advantage.  On June 15, 2015, Defendants moved this Court to dismiss the Second Amended Complaint in its entirety. In Plaintiff's Opposition to Defendants' Motion to Dismiss, Plaintiff consented to dismissal of Counts III and IV, the breach of contract and tortious interference claims.  (Pl. Opp. to Mot. to Dismiss 3.)  Because the Court previously denied Defendants' Motion to Dismiss the NYCHRL claim in its Memorandum and Order of April 2, 2015, the Court now addresses only the remaining Title VII retaliation claim.

## II.   DISCUSSION

### A.   Legal Standard for Motion to Dismiss

For a complaint to survive a motion brought pursuant to Rule 12(b)(6), the plaintiff must have pleaded "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility," the Supreme Court explained,

> [W]hen the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of entitlement to relief."

<u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Twombly</u>, 550 U.S. at 556-57).  "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  <u>Twombly</u>, 550 U.S. at 555 (internal quotation marks and citation omitted).  "In keeping with these principles," the Supreme Court stated,

> [A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.  While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

<u>Iqbal</u>, 556 U.S. at 679.  These well-pleaded factual allegations must tender more than "'a formulaic recitation of the elements of a cause of action'" or "'naked assertion[s]' devoid of 'further factual enhancement.'"  <u>Id.</u> at 678 (quoting <u>Twombly</u>, 550 U.S. at 555, 557).

In considering a motion under Rule 12(b)(6), the Court must accept as true all factual allegations set forth in the complaint and draw all reasonable inferences in favor of the plaintiff.  See <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 508 n.1 (2002);  <u>Blue Tree Hotels Inv. (Canada) Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.</u>, 369 F.3d 212, 217 (2d Cir.

11

2004).  However, this principle is "inapplicable to legal conclusions," Iqbal, 556 U.S. at 678, which, like the complaint's "labels and conclusions," Twombly, 550 U.S. at 555, are disregarded.  Nor should a court "accept [as] true a legal conclusion couched as a factual allegation."  Id. at 555.

Although legal conclusions are insufficient under the Iqbal and Twombly pleading standards, the Second Circuit has held that a plaintiff may survive a motion to dismiss by "pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant."  Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010) (internal quotation marks omitted); see also Cain v. Simon & Schuster, Inc., No. 11 Civ. 4460 (SAS), 2012 WL 2574747, at *2 (S.D.N.Y. July 3, 2012).

B.   Retaliation Claim under Title VII

Plaintiff alleges that she was retaliated against in the form of references to future potential employers beyond the parameters set forth in the Agreement. Defendants argue that Plaintiff has not stated a claim for retaliation. In particular, Defendants argue that Plaintiff fails to provide any statement by potential employers concerning any references provided by Defendants and "failed to connect the dots between the reference

12

information provided by defendants and her failure to obtain
employment." (Defs. Mot. to Dismiss Sec. Am. Compl. 11.)

### 1. Legal Standard for Title VII Retaliation

The anti-retaliation provision of Title VII, codified at 42
U.S.C. § 2000e-3, prohibits an employer from discriminating
against an employee or job applicant because that individual
opposed any practice made unlawful by Title VII or "made a
charge, testified, assisted or participated in" a Title VII
proceeding or investigation. <u>Burlington Northern and Santa Fe
Ry. Co. v. White</u>, 548 U.S. 53, 56 (2006)(citing 42 U.S.C. §
2000e-3). In <u>Burlington</u>, the Supreme Court held that the anti-
retaliation provision of Title VII is broader than the
substantive anti-discrimination provision, and includes "actions
not directly related to his employment" and those "causing him
harm <u>outside</u> the workplace." <u>Id.</u> at 63-64 (emphasis in
original).

In order to state a claim for retaliation, a plaintiff must
allege "(1) participation in a protected activity; (2) that the
defendant knew of the protected activity; (3) an adverse
employment action; and (4) a causal connection between the
protected activity and the adverse employment action." <u>Hicks v.
Baines</u>, 593 F.3d 159, 164 (2d Cir. 2010)(citation omitted). To
make out an adverse action, "a plaintiff must show that a

13

reasonable employee would have found the challenged action
materially adverse, which in this context means it well might
have dissuaded a reasonable worker from making or supporting a
charge of discrimination." Burlington, 548 U.S. at 68 (internal
quotation marks omitted).

A plaintiff can state a claim for retaliation where a
previous employer gives a negative job reference, refuses to
write a recommendation, or otherwise sullies her reputation,
thereby damaging the employee's future employment prospects.
Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 178 (2d Cir.
2005)(reasonable jury could find that negative job reference,
including a false statement that plaintiff "had a lawsuit
pending" against the employer, was adverse action); Pantchenko
v. C. B. Dolge, Co., Inc., 581 F.2d 1052, 1055 (2d Cir. 1978)
(refusal to write reference letter actionable as retaliation);
Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir.
1997) (Title VII "protects individuals from actions injurious to
current employment or the ability to secure future employment")
(emphasis in original)(collecting cases); Brescia v. Sia, No. 07
Civ. 8054, 2008 WL 1944010, at *1, 3 (S.D.N.Y. Apr. 30, 2008)
(plaintiff stated cause of action for retaliation where
plaintiff alleges that former employer "made deprecating and
disparaging comments about plaintiff" to potential employer

after plaintiff interviewed but before potential employer gave
plaintiff a formal job offer).

As to causation, the plaintiff "must establish that his or
her protected activity was a but-for cause of the alleged
adverse action by the employer" for his or her Title VII claim
to survive. Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct.
2517, 2534 (2013).  However, the "but-for" standard "does not
require proof that retaliation was the only cause of the
employer's action, but only that the adverse action would not
have occurred in the absence of the retaliatory motive."  Kwan
v. Andalex Grp. LLC, 737 F.3d 834, 846 (2d Cir. 2013).  A close
temporal relationship between the protected activity and the
adverse action may constitute circumstantial evidence of
retaliation.  Espinal v. Goord, 558 F.3d 119, 129 (2d Cir.
2009)(citing Clark County Sch. Dist. v. Breeden, 532 U.S. 268,
273-74 (2001)).  However, the Second Circuit has "not drawn a
bright line to define the outer limits beyond which a temporal
relationship is too attenuated to establish a causal
relationship between the exercise of a federal constitutional
right and an allegedly retaliatory action."  Id. (citing Gorman-
Bakos v. Cornell Co-op Extension of Schenectady Cnty., 252 F.3d
545, 554 (2d Cir. 2001)).

2. Application to Plaintiff

Defendants argue that Plaintiff's Second Amended Complaint introduces a host of new allegations that fail to cure the deficiencies outlined in the Court's Memorandum and Order of April 2, 2015 ("April 2015 Order").  As with the First Amended Complaint, the parties do not dispute here that Plaintiff makes out the first two elements of her retaliation claim.  She engaged in a protected activity by making complaints of sexual harassment and discriminatory treatment, and North Shore was aware of that protected activity, which resulted in the Agreement.

As to whether Defendants took adverse actions against Plaintiff, Plaintiff alleges that Defendant Rodgers and other employees of North Shore gave negative references to Plaintiff's reference checker and potential employers and delayed in responding to credentialing inquiries, which prevented her from securing employment after leaving North Shore.  In its April 2015 Order, the Court noted that given the equivocal nature of the statements to the reference checker, which could be construed either positively or negatively, there is a question of fact as to whether such references, if made to a potential employer, would sufficiently deter a reasonable person from reporting.  Nevertheless, the Court held that the statements by Defendant Rodgers and other doctors to Plaintiff's reference

16

checker, alone, were not adverse actions because Plaintiff did not allege that such statements were made to actual potential employers.  Furthermore, the Court found that based on Plaintiff's allegations, it could not make an inference of causation between the protected activity and any adverse action.

However, Plaintiff's additional allegations are sufficient to overcome Defendants' Motion to Dismiss.  In her Second Amended Complaint, Plaintiff alleges that she interviewed and was a leading candidate with approximately a dozen employers, only to have them cease communications after contacting the Defendants for a reference.  The Second Amended Complaint provides details about Plaintiff's progress in the application process with nine institutions, and her communications with potential employers.  For example, Plaintiff alleges that at least two potential employers, Lutheran Hospital and CDx Diagnostics, offered her positions pending her reference check, and that two others, UP and the Air Force, discussed inviting her for follow-up interviews or to begin training if all went well with her reference checks.  In addition, Plaintiff alleges that one of the potential employers worked with Defendant Rodgers at the New York Hospital of Queens and asked Plaintiff if she knew Dr. Rodgers, suggesting that he might have spoken with Dr. Rodgers about Plaintiff.  Plaintiff alleges, upon information and belief, that in each case, once the potential

employer called Defendants for references, Defendants gave
negative references.  A reasonable trier of fact could find that
these facts, if proven, are adverse actions which would deter a
reasonable person from engaging in protected activity.  Though
Plaintiff has alleged, upon information and belief, that
Defendants gave bad references, a plaintiff may survive a motion
to dismiss by "pleading facts alleged upon information and
belief where the facts are peculiarly within the possession and
control of the defendant."  Arista Records, 604 F.3d at 120
(internal quotation marks omitted).

As to causation, Defendants renew their argument that
although Plaintiff claims there is "no other explanation" for
her failure to secure employment, Plaintiff has failed to allege
"any discernible factual nexus [between] any specific statement
or conduct by defendants" and her "numerous failed job
prospects" and "failed job search efforts."  (Defs. Mot. to
Dismiss Sec. Am. Compl. 10.)  Though Defendants are correct that
some of these potential employers provided other reasons
unrelated to negative references for declining to hire
Plaintiff, such as her lack of certain certifications or the
requisite years of experience, whether it was these reasons or
negative references, as Plaintiff asserts, that prevented the
potential employers from hiring Plaintiff is a question of fact
not suitable for disposition at this stage.  Further, the Court

notes that "[a]s a practical matter, it is unlikely that an employee could secure such evidence, as such an admission would subject a potential employer to Title VII claims of its own." Jute, 420 F.3d at 179; see also Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994) (noting that "[e]mployers are rarely so cooperative as to include a notation in the personnel file that their actions are motivated by factors expressly forbidden by law" and because an "employer who discriminates is unlikely to leave a 'smoking gun' attesting to a discriminatory intent, a victim of discrimination is seldom able to prove his claim by direct evidence, and is usually constrained to rely on circumstantial evidence.")

More importantly, however, Defendants' argument fails because Defendants' focus on whether the purported negative references caused potential employers not to hire Plaintiff is misplaced. Rather, the relevant causation question is whether Plaintiff's protected activity, namely, complaining about sexual harassment, caused Defendants to give negative references to Plaintiff's potential employers. The Court previously noted that allegations regarding potential employers' reasons for declining to hire Plaintiff were relevant insofar as such allegations might support an inference that Defendants did, in fact, take adverse action against Plaintiff by making negative statements to her potential employers. (Apr. 2015 Order at 14.)

Similarly, the Court's discussion of Plaintiff's past experience and performance ratings was relevant to the question of whether Defendants gave purportedly negative references for valid or unlawful retaliatory reasons, not the question of why prospective employers declined to hire Plaintiff. (Id.)

Turning to whether Plaintiff has alleged sufficiently causation between the protected activity and the alleged adverse action, as noted previously, in the absence of direct evidence of retaliatory animus, a close temporal relationship between the protected activity and the adverse action can raise an inference of causation. Espinal, 558 F.3d at 129. Plaintiff's Second Amended Complaint provides a detailed timeline of her interviews with potential employers following her termination from North Shore. She asserts that she interviewed with Lutheran Hospital the same day that she executed the Agreement with Defendants, and with St. Barnabas only days after. She further alleges that she interviewed with other potential employers throughout the following months. She also alleges, upon information and belief, that soon after each of these interviews, the potential employers contacted Defendants for references, and received negative feedback about Plaintiff. Though the original protected activity, complaining about sexual harassment, occurred in April 2012, several months before the purported negative references were given, the short time period between the signing of the

Agreement and the alleged references, only days or weeks in the cases of Lutheran Hospital and St. Barnabas, may support a finding of causation.[4]

In sum, Plaintiff has plead sufficient additional facts to withstand the Defendants' Motion to Dismiss as to the Title VII retaliation claim. Accordingly, Defendants' Motion to Dismiss the Title VII retaliation claim is DENIED.


III.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss Plaintiff's retaliation claims under Title VII and the NYCHRL is DENIED. Defendants' Motion to Dismiss the breach of contract and tortious interference with prospective economic advantage claims is DENIED as moot.

---

[4] The Court notes that Plaintiff's Opposition to Defendants' Motion to Dismiss contains a chart outlining the "time lapse between protected activity and post-reference communication." (Pl. Opp. to Mot. to Dismiss 11-13.)  Though this chart contains additional information not explicitly alleged in the Second Amended Complaint, the Court finds sufficient the allegations in the Second Amended Complaint as to the time lapse.

21

Defendants are directed to file their Answer to the Second Amended Complaint within 30 days of the date of this Order.


SO ORDERED.


Dated:    New York, New York
          March 23, 2016




                              _____
                              Deborah A. Batts
                              United States District Judge