USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #
DATE FILED: March 31, 2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AHNA BLUTREICH,

           Plaintiff,

– against –

NORTH SHORE-LONG ISLAND JEWISH
HEALTH SYSTEM, INC., and WILLIAM
RODGERS,

           Defendants.

**OPINION AND ORDER**

13 Civ. 8583 (ER)

Ramos, D.J.:

    Ahna Blutreich ("Blutreich"), brings this action against North Shore-Long Island Jewish Health System, Inc. ("North Shore") and William Rodgers ("Rodgers") (collectively "Defendants") for retaliation claims under Title VII of the Civil Rights Act of 1964 ("Title VII") and the New York City Human Rights Law ("NYCHRL"). Before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, Defendants' motion is granted.

**I.    BACKGROUND[1]**

    **A.    Factual Background**

    The Court assumes the parties' familiarity with the underlying facts and only recounts below facts that are relevant for purposes of the instant motion. Additionally, the following facts are undisputed except where otherwise noted.

---

[1] The following facts are drawn from Defendants' Rule 56.1 Statement ("Defs.' Stmt."), Doc. 92, Blutreich's Rule 56.1 Statement ("Blutreich's Stmt."), Doc. 96, and the parties' supporting submissions. Any citation to the parties' Rule 56.1 Statements incorporates by reference the documents cited therein.

In July 2010, Blutreich began working at Lenox Hill Pathology, P.C. ("Lenox Hill P.C.") as a physician in the pathology department. *See* Defs.' Stmt. ¶ 2; *see* Blutreich's Stmt. ¶ 2. The employment contract did not identify a specific title for Blutreich. *See* Doc. 93 Ex. B. Lenox Hill P.C. was a captive P.C. whose sole purpose was to provide pathology services to Lenox Hill Hospital pursuant to a service agreement. *See* Doc. 94 Ex. 10 ("Rodgers' Dep. Tr.") at 8:5-10:11. On November 8, 2011, Blutreich saw that her title was listed as "assistant pathologist" on an excel spreadsheet for pathologists who had not had their flu shot. She emailed Rodgers, the head of Lenox Hill P.C. and her supervisor, inquiring as to why, since she believed she was hired as a staff pathologist.[2] *See* Doc. 93 Ex. G. at 2.

In December 2011, Lenox Hill Hospital was acquired by North Shore. *See id*. at 10:12-21; *see also* Doc. 93 Ex. A ("Blutreich's Dep. Tr.") at 48:6-19. On December 15, 2011, Blutreich received a document via mail titled "Lenox Hill Hospital Employment Agreement" from North Shore that stated, in relevant part:

> I am writing to inform you that effective December 18, 2011 your employment will be transferred from Lenox Hill Pathology, PC…to Lenox Hill Hospital….Your employment agreement with the P.C. will terminate as of that date….Please be advised that Lenox Hill Hospital intends to honor the compensation terms set forth in your P.C. Employment Agreement.

Doc. 93 Ex. E. According to Defendants, in accordance with the terms of her new agreement, Blutreich's employment with Lenox Hill P.C. ended and she was rehired by Lenox Hill Hospital as of December 18, 2011. Defs.' Stmt. ¶ 5. Blutreich argues, however, that the letter simply stated that her employment with Lenox Hill P.C. was transferred to Lenox Hill Hospital, not that it ended. Blutreich's Stmt. ¶ 5. In any event, it is undisputed that Blutreich started working at Lenox Hill Hospital for North Shore, which owned the hospital, on that day. Defs.' Stmt. ¶ 6;

---

[2] It is unclear from the record if and what Rodgers responded.

Blutreich's Stmt. ¶ 6.  On January 19, 2012, Blutreich received a letter titled "Reappointment" from Frank Danza ("Danza"), an executive director at North Shore, that stated "I am pleased to inform you that the Board of Trustees has approved your reappointment to the Active Staff at Lenox Hill Hospital commencing on 02/01/2012 through 01/31/2013 as an Assistant Attending…in the Department of [Pathology]."  *See* Doc. 93 Ex. H.  The Human Resources database at North Shore indicates that, on January 30, 2012, Blutreich's title was Assistant Pathologist and that she was hired by North Shore on December 18, 2011.  *See* Doc. 93 Ex. G. at 8; *see also* Defs' Stmt. ¶ 19.

On February 3, 2012, Blutreich sent an email to Rodgers, which stated, in relevant part, that it made a big difference to her that she was hired as a staff pathologist as opposed to assistant pathologist, and that North Shore wrote that they were honoring what was written in her contract with Lenox Hill P.C..[3]  *See* Doc. 93 Ex. G. at 5.  On February 4, Rodgers responded that "[y]our contract with [Lenox Hill P.C.] is the same as all pathologists including the term staff pathologist….Your hospital medical staff appointment is consistent with [Lenox Hill Hospital] standards and appropriate for your [] education experience and clinical performance."  *Id* at 6.  At her deposition, Blutreich testified that it was her understanding that her title was changed to assistant pathologist when she went to work for North Shore.  Blutreich's Dep. Tr. at 316:4-7.

Blutreich was terminated by North Shore on April 19, 2012.  Defs.' Stmt. ¶ 9; Blutreich's Stmt. ¶ 9.  It was only then that Blutreich claimed that before she was terminated, she was subjected to sexual harassment by Rodgers.  SAC ¶¶ 14–15.  Blutreich alleged that she was fired without cause when she finally asked Rodgers to stop the harassment.  *Id*.  Defendants

---

[3] While it appears that Blutreich was referring to the December 18, 2011 "Lenox Hill Hospital Employment Agreement," that letter only stated that North Shore was honoring her compensation terms in her employment agreement with Lenox Hill P.C.  In addition, Blutreich's employment contract did not include her specific employment title.

3

investigated her allegations and spoke to Rodgers and three other persons, but Blutreich argues that Defendants did not perform a meaningful investigation because they did not confront Rodgers with all of her allegations and did not interview any other females in the pathology department. Blutreich's Stmt. ¶ 12; *see also* Doc. 93 Ex. 11 at 19:19-25. The investigation ultimately concluded in favor of Rodgers. Blutreich's Stmt. ¶ 12. Blutreich's then-attorney negotiated an out-of-court settlement with Lenox Hill Hospital.[4] *Id.*

On July 18, 2012, Blutreich and Lenox Hill Hospital, North Shore, signed a separation agreement and general release (the "Separation Agreement"). *See* Doc. 93 Ex. F. Pursuant to the Separation Agreement, the parties agreed not to "engage in any conduct that [was] injurious to the other's reputation or interest or disparage the other." *Id*. § 17(c). North Shore agreed to respond to all credentialing[5] inquiries using the following language:

> Dr. Blutreich was first granted privileges at Lenox Hill Hospital in 2010. As a result of Lenox Hill Hospital's merger with North Shore–Long Island Jewish Health System and the closure of Lenox Hill P.C., a review of current staffing levels led to the decision not to renew Dr. Blutreich's contract with the employer.

*Id*. ¶ 18(a). In addition, the Separation Agreement provided that:

> So long as any requests for non-credentialing inquiries and/or requests for rerferences [*sic*] are directed to the attention of Glenn Courounis, Vice President, Human Resources, Lenox Hill Hospital, Employer will provide a neutral reference for [Blutreich], including only [Blutreich's] position, dates of employment and, if requested in writing, last salary.

*Id*. ¶ 18 (b).

---

[4] Blutreich conceded that the underlying sexual harassment and her subsequent termination are not the subjects of this action. Doc. 15, 2 n.1. This action only concerns alleged retaliation and wrongdoing that occurred after the Separation Agreement was executed. *Id.*

[5] Physicians must be credentialed to obtain medical practice privileges at a healthcare institution. Credentialing means confirmation by the employer upon request by the hiring entity, of [Blutreich's] professional qualifications, medical privileges and documentation of same, including identification of medical practice issues. Defs' Stmt. ¶ 45; Blutreich's Stmt. ¶ 45.

To respond to employment verification requests, North Shore used a third-party entity named Verify Job System ("VJS"), an automated employment verification system whose database imports directly from the North Shore's Human Resources database. Defs' Stmt. ¶¶ 15–18; Blutreich's Stmt. ¶¶ 16–18.

After leaving North Shore, Blutreich applied widely for employment and had mixed results. Specifically, Blutreich was hired as a staff pathologist by St. Francis Hospital and various other employers on a temporary basis.[6] Defs' Stmt. ¶¶ 21–23. In addition, Blutreich was successfully credentialed to work for three temporary physician staffing companies including CompHealth, Barton Associates and Weatherby Locums. Defs' Stmt. ¶ 47. According to Blutreich, Weatherby and CompHealth never hired her. Blutreich's Stmt. ¶ 47. Through Barton Associates, Blutreich was assigned to work as a pathologist at Columbia Memorial Hospital. Defs' Stmt. ¶ 55.

However, Blutreich identified twelve other prospective employers that she applied to but did not hire her.[7] Defs' Stmt. ¶ 28; Blutreich's Stmt. ¶ 28. Blutreich claimed that with respect to each of those prospective employers, she went through the interview process and was offered employment subject to a reference check, "only to have the prospective employer suddenly break off the contact." See Doc. 18 ¶ 18. Blutreich further claimed that she then hired a reference checker to investigate by asking for a reference from Rodgers and Samuel Wahl ("Wahl").[8] Id. ¶

---

[6] Blutreich alleges that these were only temporary positions and that the St. Francis Hospital did not conduct a background check prior to hiring her. Blutreich's Stmt. ¶¶ 21, 22–24. She ended her employment at St. Francis after 30 days allegedly due to hazardous working conditions. Blutreich's Stmt. ¶ 22.

[7] They include Beth Israel/Mount Sinai, Cancer Center of America, University Pathologists, Rhode Island, Lutheran Hospital, Morristown Memorial Hospital, Harlem Hospital, South Nassau Communities Hospital, CDx Diagnostics, The Medical Affairs Company, Pfizer, United States Air Force, Plantation Hospital, and St. Barnabas Medical Center.

[8] Wahl was a director, then the acting chairman of the Department of Pathology at Lenox Hill Lenox Hill Hospital. See also Doc. 94 Ex. 8 ("Wahl's Dep. Tr.") at 8:3-16

5

38. However, Blutreich admits that she never offered either Rodgers or Wahl to those twelve prospective employers as references. Blutreich's Stmt. ¶ 29.

During the course of this litigation, Blutreich has produced records relating to all twelve prospective employers. *See* Defs' Stmt. ¶¶ 33–36. Those records contain no evidence of any negative reference given by Defendants, or even communications between Defendants and the twelve identified employers. *See* Defs' Stmt. ¶ 37; Blutreich's Stmt. ¶ 37. However, they do contain one employment background check produced in response to a single employment verification request, *See* Doc. 94 Ex. 3-B, and three credentialing requests as mentioned above. Defs' Stmt. ¶ 47; Blutreich's Stmt. ¶ 47.

Specifically, the credentialing request from Weatherby Locums took a little less than three months to complete. Doc. 93 Ex. S. Upon completion, Lisa McCabe, who according to Blutreich was Weatherby Locums' "credentialing expert," *see* Doc. 18 ¶ 43, emailed Blutreich stating that "[North Shore] was very helpful" with the credentialing request. *See* Doc. 94 Ex. S at 2. The request for employment verification from the Medical Affairs Company, one of the twelve prospective employers that did not hire Blutreich, was completed by Defendants in five days. *See* Doc. 94 Ex. 3-B; *see also* Doc. 94 Ex. 4. The resulting employment report noted Blutreich's title as "Assistant Pathologist" and her start date as December 18, 2011. *See* Doc. 94 Ex. 3-B at 6. According to Blutreich, the Medical Affairs Company offered the job to someone else after her background check was completed.

In addition to documentary evidence, Blutreich took the depositions of two prospective employers, namely Helen Richards ("Richards") from Harlem Hospital Center, and Dr. Klaus Schreiber ("Schreiber") from CDx Laboratories. Defs' Stmt. ¶ 38. At the deposition, Blutreich's counsel asked if Richards recalled whether she had called any of Blutreich's references before

she ultimately hired someone else. *See* Doc. 93 Ex. Q at 10:16-18. In response, Richards testified that "[o]ur practice is not to call references until we interview the candidate, and then we don't call references unless we think we are going to hire that candidate…I had no reason to call any references." *Id*. at 10:19-23. In response to similar questions, Schreiber testified that he "had no recollection of speaking to anyone about Blutreich." Doc. 93 Ex. R ("Schreiber's Dep. Tr.") at 20:4-5. Schreiber also testified that he hired someone with more experience. *Id*. at 21:2-13.

Blutreich also took the depositions of Rodgers and Wahl. *See* Blutreich's Stmt. ¶ 37. Wahl testified to speaking about Blutreich with a reference checker over the phone on November 15, 2012. Walh's Dep. Tr. at 71:21-73:3; *see also* Doc. 18 (the Second Amended Complaint) ¶ 38. Specifically, Wahl recalled that he commented to the reference checker that "[t]here was some personality issues," but that "[Blutreich] was a competent pathologist." Wahl's Dep. Tr. at 73:10-18, 74:25-75:3.

Rodgers also testified to speaking with someone else about Blutreich on two occasions. Rodgers' Dep. Tr. at 73: 20-74:9; Blutreich's Stmt. ¶ 37. Specifically, Rodgers told Mark Friedman, who was a director at Lenox Hill Hospital at the time, at some point between April 2012 and December 2012 that Blutreich "left in good standing and [he] couldn't comment any further." Rodgers' Dep. Tr. at 74:14-76:16; Blutreich's Stmt. ¶ 37. Rodgers also testified that he spoke to a reference checker about Blutreich at some point between April 2012 and December 2012. Rodgers' Dep. Tr. at 93:3-23; *see also* Doc. 18 ¶ 38. Specifically, Rodgers recalled that he told the reference checker that "I can tell you that she left in good standing, however due to a non-disclosure agreement…I am not in a position to comment." *Id*. 94:5-19.

In a declaration appended to her opposition papers, Blutreich testified that she interviewed with various prospective employers, but none had made her an offer even though they had interviewed with her. Doc. 95 ("Blutreich's Decl.") ¶¶ 4–7. Blutreich also testified that "[e]ven though Dr. Schreiber testified he did not contact any of my references, Dr. Joan Cangiarella[9] told me that Dr. Screiber [*sic*] contacted her regarding a job," *id.* ¶ 19, and that "[e]ven though Dr. Helen Richards testified that she did not call my references, I was informed by Dr. Mahle[10] that she had been contacted by Dr. Richards concerning Plaintiff," *id.* ¶ 20. Blutreich further testified that "[b]ased upon [her] experience, credentialing takes three months for full-time hospital attending positions…and as little as one month for temporary positions, due to the immediate need for coverage." *Id.* ¶ 18.

Blutreich also produced certain number of her prior attorney's emails in discovery. Doc. 94 Ex. 6. They mostly concerned requests to correct Blutreich's reported title and start date at North Shore, as well as clarifying the ways to submit a reference request. *See generally id.* The last email stated that "we had been informed that [North Shore] had not provided a reference to the Torbion Group of Independent Recruiters, although the applicable form had been faxed as…requested." *Id.* at 9. According to Blutreich, this shows that Defendants had failed to timely respond to several requests for references by prospective employers.

---

[9] According to Schreiber, Dr. Joan Cangiarella was his fellow for a year and then went to NYU. Schreiber's Dep. Tr. At 22:17-22.

[10] According to Blutreich's deposition testimony, Dr. Mahle was an attending pathologist at Lenox Hill Lenox Hill Hospital. Blutreich's Dep. Tr. At 96:7-8.

B.  **Procedural Background**

Blutreich commenced this case on December 3, 2013. Doc. 1. On February 3, 2014, Defendants moved to dismiss the initial complaint. Doc. 5. On February 25, 2014, Blutreich filed an amended complaint, Doc. 9, and Defendants again moved to dismiss, Doc. 10. On April 2, 2015, the Court denied Defendants' motion to dismiss Blutreich's NYCHRL claim but granted it with respect to all other claims without prejudice. Doc. 15. On May 1, 2015, Blutreich filed the Second Amended Complaint. Doc. 18. Defendants, for the third time in this case, moved to dismiss on June 15, 2015. Doc. 22. On March 23, 2016, the Court denied Defendants' motion to dismiss. Doc. 33. On April 22, 2016, Defendants filed their answer. Doc. 36. On September 17, 2018, Defendants moved for summary judgment.

## II. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *Scr Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might affect the outcome of the litigation under the governing law. *Id*. The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (citing *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise. *Goenaga v. March of dimes birth defects found.*, 51 F.3d 14, 18 (2d Cir. 1995). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F.Supp. 2d at 467–68 (citing *Anderson v. Liberty lobby*, 477 U.S. 242, 256–57 (1986)).

## III. DISCUSSION

### 1. Blutreich's Retaliation Claims

To state a *prima facie* case of retaliation under Title VII, a plaintiff must show that: (1) she engaged in protected activity; (2) her employer was aware of this activity; (3) she suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action. *See Guzman v. City of New York*, 93 F. Supp. 3d 248, 261 (S.D.N.Y. 2015) (citing *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010)).

Here, the only two elements at issue are "materially adverse action" and "causal connection." Blutreich alleges that Defendants took three materially adverse employment actions: (1) providing negative references to her prospective employers; (2) providing inaccurate information about her title and dates of employment with North Shore; and (3) intentionally delaying in responding to credentialing or references inquiries. In response, Defendants contend that Blutreich has failed to state a *prima facie* case that she suffered any adverse action, or that

retaliation was a but-for cause of any adverse action. The Court addresses the parties' arguments concerning each alleged adverse action in turn.

### A. *Negative References*

As the Court previously stated in its March 23, 2016 Order denying Defendants' motion to dismiss (the "March 23 Order"), a plaintiff can state a claim for retaliation where a previous employer gives a negative job reference, refuses to write a recommendation, or otherwise sullies her reputation, thereby damaging the employee's future employment prospects. *See* Doc. 33 at 14; *see also Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 178 (2d Cir. 2005) (reasonable jury could find that negative job reference, including statement that plaintiff "had a lawsuit pending" against the employer, was adverse action); *Brescia v. Sia*, No. 07 Civ. 8054(WCC), 2008 WL 1944010, at *1, *3 (S.D.N.Y. Apr. 30, 2008) (plaintiff stated cause of action for retaliation where plaintiff alleges that former employer "made deprecating and disparaging comments about plaintiff" to potential employer).

However, the Court also noted in that Order that statements made only to a reference checker are insufficient to state a claim regardless of whether the jury considers them sufficiently adverse to deter a reasonable employee, unless there is some evidence that similar statements were made to actual prospective employers. *See* Doc. 33 at 16–17. Under the law of the case doctrine, "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case" unless "cogent and compelling reasons militate otherwise." *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) (internal quotations omitted). Here, Blutreich has not offered any reason for the Court to deviate from its earlier holding. *See id* at 99–100 (such "cogent" or "compelling" reasons include "an intervening change in law,

availability of new evidence, or 'the need to correct a clear error or prevent manifest injustice.'") (internal quotations omitted).

After six years of litigation during which extensive discovery took place, including documents from a dozen of Blutreich's prospective employers and deposition testimony from two of them, Blutreich has not uncovered any evidence tending to support the proposition that Defendants provided negative references to any of her actual prospective employers. Instead, the record establishes that there were only two occasions where Rodgers and Wahl may have provided less than stellar references for Blutreich, neither of which was to an actual prospective employer. It is undisputed that on both occasions, Rodgers and Wahl spoke to a reference checker that Blutreich hired. Moreover, Blutreich acknowledged that she never offered Rodgers or Wahl as references to any prospective employers. Blutreich's Stmt. ¶ 29. Under the March 23 Order, neither of those statements are actionable.

Blutreich contends that "[t]he fact that Dr. Rodgers provided [negative] information to a reference checker could allow a reasonable jury to conclude that he made similar statements when contacted by others." Blutreich's Mem. at 11. In support of her contention, Blutreich points to a footnote in *Apionshev v. Columbia Univ.*, No. 09 Civ. 6471(SAS), 2011 WL 1197637, at 7* n.88 (S.D.N.Y. Mar. 25, 2011).

However, a close examination of the footnote reveals that it does not say what Blutreich contends it does. Specifically, the footnote, in preserving plaintiff's retaliation claim, cited *Memnon v. Clifford Chance US, LLP*, 667 F. Supp. 2d 334 (S.D.N.Y. 2009), for its holding that "a former employer's spreading of negative information or references to a prospective employer is sufficient to constitute an adverse employment action." *See id*. Contrary to Blutreich's assertion, the footnote similarly requires any negative information or references to be made to an

actual prospective employer in order to support a retaliation claim, rather than to a reference checker. It preserved plaintiff's retaliation claim precisely because plaintiff alleged that defendant provided a negative reference to an actual prospective employer, which the Court in *Apionshev* had to accept as true on a Rule 12(c) motion for judgment on the pleadings.

On a motion for summary judgment, Blutreich can no longer rely on her bare allegation in the SAC that "upon information and belief," Rodgers or Wahl gave negative references to prospective employers, but must submit some evidence supporting her allegation. *See Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (On a motion for summary judgment "the nonmoving party may not rely on mere conclusory allegations or speculation, but instead must offer some hard evidence in support of its factual assertions."). Here, Blutreich has failed to show that either Rodgers or Wahl was ever contacted by any of her actual prospective employers.

The parties are in dispute only with regards to two of Blutreich's prospective employers, Schreiber and Richards. Again, the record before the Court is devoid of evidence that either Schreiber and Richards actually contacted Rodgers or Wahl for references. To the contrary, Schreiber testified that he had "no recollection of speaking to anyone" regarding Blutreich. *See* Schreiber's Dep. Tr. at 19:25-20:5. Schreiber further testified that he does not know a Dr. Wahl." *See id* at 22:6-9. In addition, Dr. Richards testified that "Our practice is not to call references...unless we think we are going to hire that candidate...I had no reason to call any references [of Blutreich]." *See* Richards' Dep. Tr. at 10:16-23.

Nor can Blutreich rely on her own testimony that Schreiber and Richards actually contacted Rodgers or Wahl for references. First, Blutreich testified that "[e]ven though Dr. Schreiber testified he did not contact any of my references, Dr. Joan Cangiarella told [me] that

13

Dr. Schreiber [*sic*] had contacted her regarding a reference. Blutreich's Stmt. ¶ 106. However, the record shows that it was Dr. Cangiarella who called Schreiber, not the other way around. *See id*. at 2. Moreover, even if Schreiber spoke to Dr. Cangiarella about Blutreich, it does not follow that he also contacted Rodgers or Wahl about her. This is especially so given Blutreich's admission that she never offered Rodgers or Wahl as references, and Schreiber's testimony that he was looking for, and ultimately hired, a candidate with more experience than Blutreich.[11] *See* Schreiber's Dep. Tr. at 10:5-10.

Next, Blutreich again testified that "[e]ven though Dr. Helen Richards testified that she did not call [my] references, [I] was informed by Dr. Mahle that she had been contacted by Dr. Richards concerning a reference for [Blutreich]." Blutreich's Stmt. ¶ 107. Once again, even if Richards spoke to Dr. Mahle, it does not follow that Richards also contacted either Rodgers or Wahl. In any event, Blutreich's testimony as to what others told her about their conversations with Schreiber and Richards, are inadmissible hearsay that could not be used to overcome a motion for summary judgment. *See Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985) (internal citations omitted).

Accordingly, Blutreich fails to show that Defendants provided a single negative reference to any of her actual prospective employers. *See Memnon v. Clifford Chance US, LLP*, 667 F. Supp. 2d 334, 343 (S.D.N.Y. 2009) (granting summary judgment on plaintiff's retaliation claim where there was no evidence of any communication between plaintiff's former employer and her prospective employers).

---

[11] Dr. Cangiarella informed Blutreich that Schreiber was considering another candidate. *See* Doc. 94 Ex 7 at 1 ("The only issue is that he said he was considering another candidate as well….").

### B. *Inaccurate Background Information*

Blutreich's next grievance is that Defendants reported that her title was listed as "Assistant Pathologist" and her start date was listed as "December 2011" on her background check. *See* Doc. 94 Ex. 3-B at 6. According to Blutreich, her title should have been "Staff Pathologist," and her start date with Lenox Hill should have been July 2010. The Court disagrees and finds that both her title and start date were accurately reported.

First, Blutreich's reliance on Lenox Hill Hospital Employment Agreement, as evidence that her start date should have been July 2010, is misplaced. *See* Doc. 93 Ex. E. Specifically, Blutreich argues that the Letter clearly shows that there was no interruption in her employment when Lenox Hill P.C., was transferred to Lenox Hill Hospital, owned and managed by North Shore. Although the Letter appears to support Blutreich's position when it stated that effective December 18, 2011, her "employment will be *transferred* from Lenox Hill Pathology, PC, to Lenox Hill Hospital," the immediate next sentence unequivocally stated "[a]ccordingly, your employment agreement with the P.C. will terminate as of that date." *Id*. This makes clear that Blutreich's employment relationship with Lenox Hill P.C. ended on December 18, 2011, and that she was rehired by North Shore the same day.

In addition, Blutreich does not and cannot dispute that Lenox Hill Hospital and Lenox Hill Pathology PC are two separate entities. Therefore, her employment relationship with Lenox Hill Hospital, an entity owned and managed by North Shore, commenced on December 18, 2011, as accurately reported in her background check. In any event, Blutreich's retaliation claim on this basis would also fail because her start date in North Shore's Human Resources database was recorded long before her complaint of sexual harassment, not in response to her complaint *See Nakis v. Potter*, 422 F. Supp. 2d 398, 423 (S.D.N.Y. 2006) (holding that an adverse action was

not casually connected to protected activity "because it predate[d], rather than follow[ed], the date that she engaged in protected activity").

Blutreich's argument that her title should have been reported as "Staff Pathologist" instead of "Assistant Pathologist" fares no better. In fact, Blutreich testified in her deposition that she understood her title was changed to assistant pathologist when she went to North Shore. The record before this Court establishes that her title was actually "Assistant Pathologist" before her complaint. Specifically, a letter addressed to Blutreich from North Shore titled "Reappointment" makes clear that her title was "*Assistant Attending* with the attached clinical privileges in the Department of Pathology." Doc. 93 Ex. H (emphasis added). Therefore, to the extent that Blutreich argues that her title as a "Staff Pathologist" at Lenox Hill P.C.[12] should have continued onto her employment with Lenox Hill Hospital, that argument is misguided in light of the Reappointment letter.

Furthermore, Blutreich's citation to the deposition of Wahl and Rodgers where she was referred to as a "pathologist," does not raise an issue of material fact. Blutreich's Stmt. ¶ 59. Indeed, the fact that either Wahl or Rodgers referred to Blutreich as a pathologist during their respective depositions, did not make it more likely that she was a Staff Pathologist at North Shore as opposed to an Assistant Pathologist. Accordingly, Blutreich's retaliation claim on this basis must likewise fail. In any event, her claim must also fail because any recordation of her title as an Assistant Pathologist also predated her protected activity.[13]

---

[12] It is not even clear that her title at Lennox Hill P.C. was Staff Pathologist. While Rodgers wrote in one email that her contract with Lenox Hill P.C. "is the same as all pathologists including the term staff pathologist," her actual employment contract at Lenox Hill P.C. contained no mention of her title. *See* Doc. 93 Ex. G at 5; *see also* Doc. 93 Ex. B. Additionally, she was listed as an "Assistant Pathologist" on an excel spreadsheet of pathologists who had not had their flu shots in November 2011. *See id.* at 1.

[13] Blutreich's contention that Defendants' refusal to amend her background check afterwards constitutes direct evidence of retaliatory motive misses the point. As the March 23 Order made clear, the relevant causation question is whether Blutreich's protected activity caused Defendants to engage in the materially adverse action, namely the provision of inaccurate information. *See* Doc. 33, 19. Here, Defendants' later refusal to amend her title was

16

### C. *Intentional Delay*

Lastly, Blutreich contends that Defendants' delay in responding to credentialing requests, a request for employment verification, and reference requests from her prospective employers constitute materially adverse action. The Court disagrees.

At the outset, Blutreich cites to no legal authority, nor is the Court aware of any, that address whether delays in responding to such requests constitute materially adverse actions within the meaning of the Title VII. However, as the Second Circuit has explained, there are no bright-line rules as to what amounts to a materially adverse action so courts must "pore over each case to determine whether the challenged [] action reaches the level of adverse." *Wanamaker*, 108 F.3d at 466. The key inquiry is whether the challenged action "might have dissuaded a reasonable worker from making or supporting the protected activity." *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006).

In addition, context matters, as an "act that would be immaterial in some situations is material in others." *See id*. at 69 (internal quotation omitted). Nevertheless, Title VII is not a "general civility code for the American workplace." *Id*. (internal citation and quotation marks omitted). Furthermore, the term "material" separates significant adverse action from "trivial harms," "petty slights [or] minor annoyances." *See id*. (internal citations omitted).

With respect to the credentialing requests, the parties fight over one specific request, the request by Weatherby Locums in connection with Blutreich's application for a temporary position. Blutreich's Mem. at 13; Defs.' Mem. at 17. It is undisputed that that request was completed in a little less than three months. By Blutreich's own account, credentialing in

---

completely consistent with Defendants' refusal to amend her title prior to her protected activity. *See* Doc. 93 Ex. G at 5.

17

general takes approximately three months to complete at most hospitals. *See* Blutreich's Dep. Tr. at 94:8-9. However, for the first time in this case, Blutreich testifies in her declaration that "based on [her] experience," credentialing is "expedited for temporary positions" and "takes as little as one month due to the immediate need for coverage." Blutreich's Decl. ¶ 18.

Nevertheless, drawing every reasonable inference in favor of Blutreich, the fact that credentialing can take "as little as one month," without more, does not make a three-month credentialing period unreasonable, much less to make it so unreasonable that it would dissuade a reasonable employee from engaging in protected activity. This is especially so in light of the successful credentialing at two other temporary physician staffing companies that Blutreich does not dispute, and the email from Lisa McCabe, who according to Blutreich was Weatherby Locums' "credentialing expert," *see* Doc. 18 ¶ 43, that stated that "[North Shore] was very helpful" with the credentialing request. *See id.* Ex. S at 2.

Next, Blutreich relies solely on a series of emails addressed to Defendants, Doc. 94 Ex. 6, to contend that Defendants intentionally delayed in responding to reference requests by prospective employers. However, these emails were sent by Blutreich's prior attorney rather than prospective employers. Specifically, the most relevant email stated, in relevant part, that "we had been informed that [North Shore] had not provided a reference to the Torbion Group of Independent Recruiters, although the applicable form had been faxed as…requested." *Id*. at 9. Again, this email, offered as proof that Defendants had unreasonably delayed in responding to a reference request, is laced with layers of hearsay, for which no showing of admissibility is made. In any event, the "Torbion Group of Independent Recruiters" is not even identified as one of the prospective employers that Blutreich claims she applied to but had not hired her.

18

As for the only request for employment verification in the record, it is clear that the request was completed within five days. *See* Doc. 94 Ex. 3-B at 2 ("Report requested on 4/10/2013 and completed on 4/15/2013"); *see also* Doc. 94 Ex. 4. Accordingly, the Court finds that a reasonable jury could not have concluded that a request for employment verification that was completed within five days, rises to the level of a materially adverse action within the meaning of Title VII.

For the foregoing reasons, Blutreich has failed to state a *prima facie* case that she suffered any materially adverse action. Accordingly, the Court grants Defendants' motion for summary judgment on her Title VII retaliation claim.

### 2. Blutreich's NYCHRL Claim

NYCHRL prohibits employers from "retaliat[ing[ or discriminat[ing] in any manner against any person because such person has … opposed any practice forbidden" under the law. Restoration Act § 3 (amending N.Y.C. Admin. Code § 8-107(7)). "To prevail on a retaliation claim under the NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination, and that as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 112 (2d Cir. 2013) (citations omitted). NYCHRL claims should be broadly interpreted in favor of plaintiffs and "must be analyzed separately and independently from federal and state discrimination claims." *Id*. at 112–13.

Further, under NYCHRL, it is an "unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under [NYCHRL]," including discrimination and retaliation. N.Y. Code § 8-107; *see also Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 367 (S.D.N.Y. 2012); *Nicholson v. Staffing Authority*,

No. 10 Civ. 2332, 2011 WL 344101, at * 2 (S.D.N.Y. Feb. 1, 2011) (discussing the "virtually identical" language of the City and State's aider and abettor liability, but highlighting the City's more liberal construction of the provision as compared to the state and federal analogues).

Here, Blutreich has failed to state a retaliation claim under NYCHRL even under its more liberal standard. Simply put, Blutreich has failed to establish that she suffered any adverse action that "disadvantaged her." *See Fletcher v. Dakota, Inc.*, 99 A.D.3d 43, 51–52 (N.Y. App. Div. 1st Dep't. 2012) (prohibiting retaliation of any kind that "disadvantaged" plaintiff even if it does "not result in an ultimate action [] or in a materially adverse change.").

Although a reasonable jury could differ on the nature of Rodgers and Wahl's comments to a reference checker, those comments could not have disadvantaged Blutreich in any way because none of them were made to an actual prospective employer. Because Blutreich fails to demonstrate a primary violation of the NYCHRL, her aiding and abetting claims must necessarily also be dismissed. *See Caravantes v. 53rd St. Partners, LLC*, No. 09 Civ. 7821(RPP), 2012 WL 3631276, at *20 (S.D.N.Y. Aug. 23, 2012) ("[a]iding and abetting is only a viable theory where an underlying violation has taken place.") (internal citation omitted).

## IV. CONCLUSION

For the aforementioned reasons, Defendants' motion for summary judgment is GRANTED. The Clerk of the Court is respectfully directed to terminate the motion, Doc. 90, and close the case.

It is SO ORDERED.

Dated: March 31, 2020
New York, New York

_____
Edgardo Ramos, U.S.D.J.